## GARDENHIRE v. GARDENHIRE.
(No. 10391.)

(Court of Civil Appeals of Texas. Fort Worth. Nov. 3, 1923. Rehearing Denied Dec. 1, 1923. Writ of error dismissed for want of jurisdiction Jan. 23, 1924.)

**1. Divorce ☞184(12)—Exclusion of testimony as to facts covered by other testimony admitted, held harmless.**

In a suit for divorce and division of property, the exclusion of statements made by husband's deceased father relating to property, offered to show that such property was not community property, even if erroneous, was harmless, where other testimony to the same purport by the same witnesses was admitted.

**2. Evidence ☞291—Declarations of decedents admissible to prove pedigree, birth, etc.**

Declarations and answers made by persons deceased at the time of the trial are admissible to prove pedigree, birth, etc.

**3. Evidence ☞271(17)—Declarations of decedent as to his title to property not admissible after he has parted with it.**

Ordinarily declarations of decedent as to his title to property, after he has parted with title, are not admissible.

**4. Divorce ☞184(12)—Assignments of error for excluding evidence where trial is by court overruled.**

In a suit for divorce and division of property, assignments of error that statements by husband's deceased father relating to property, offered to show that it was not community property, were improperly excluded, were overruled, where the case was tried by the court without a jury.

**5. Divorce ☞286—Finding on conflicting evidence not disturbed on appeal.**

In a suit for divorce and division of property, where evidence was sharply conflicting, a finding that property was purchased with community funds could not be disturbed.

**6. Husband and wife ☞257—Property purchased with revenue from husband's separate estate prior to 1917 held community property.**

Under Rev. St. art. 4621, as amended by Act 1913 (Vernon's Sayles' Ann. Civ. St. 1914, art. 4621), as it existed prior to the amendment of 1917 (Vernon's Ann. Civ. St. Supp. 1918, art. 4621), rents and revenues from the husband's separate estate became community property, and property, to the extent paid for with such revenue, became community property.

**7. Husband and wife ☞264—Evidence held to warrant finding personal property belonged to community.**

In a suit for divorce and for division of property, evidence *held* to warrant a finding that all of the personal property listed in husband's inventory was paid for out of community funds, or accumulated by the efforts of both parties.

**8. Divorce ☞252—Wife held entitled to one-half of cash on hand at time of separation.**

In a suit for divorce and division of property, *held*, that the court should have awarded each party one-half of the cash on hand at the time of the separation, instead of computing the wife's share by adding to the cash on hand a check given to her by the husband several months before, and deducting from one-half thereof the amount of such check.

### On Motion for Rehearing.

**9. Evidence ☞229—When declarations of third party admissible against party stated.**

The declarations of a third person are admissible against a party whenever privity of estate exists between the declarant and such party.

**10. Evidence ☞271(17)—Declaration of decedent relating to purchase of property for son held inadmissible.**

Declarations of a deceased ancestor are not admissible in behalf of a party to establish title to real estate, especially where there is no privity of estate between the ancestor and the party seeking to introduce such declarations, and hence declarations by decedent that he had purchased the property for his son, which was conveyed directly from owner to son, were inadmissible, either under exception to the hearsay rule or as part of the res gestæ.

**11. Husband and wife ☞264—Evidence held to sustain finding purchase of realty was made out of husband's separate property prior to 1917.**

In a suit for divorce and division of property, evidence *held* sufficient to sustain finding that land was purchased out of rentals from husband's separate property prior to the amendment of 1917 of Rev. St. art. 4621 (Vernon's Ann. Civ. St. Supp. 1918, art. 4621), and that it was therefore, to that extent, community property.

Appeal from District Court, Stephens County; W. R. Ely, Judge.

---

Suit by Mrs. K. C. Gardenhire against A. B. Gardenhire. Judgment for plaintiff, and defendant appeals, and plaintiff reserves cross-assignments. Reformed and affirmed.

Scott, Brelsford, Funderburk & Ferrell, of Eastland, for appellant.

Burkett, Orr & McCarty, of Eastland, for appellee.

BUCK, J. Mrs. K. C. Gardenhire sued her husband, A. Brown Gardenhire, for a divorce and a division of the property. Both parties reside in Stephens county. From a judgment granting a divorce to plaintiff, awarding plaintiff and defendant each a one-half interest in the northeast and the northwest quarter of section No. 90, block 4, Texas & Pacific Railway Company survey, as community property of plaintiff and defendant, and awarding plaintiff $6/16$ and awarding defendant $10/16$ of the southwest quarter of section 49, block 6, Texas & Pacific Railway Company survey, and making a division of the personal property, which the court found was community property, the defendant has appealed, and plaintiff has reserved cross-assignments.

The first assignment complains of the refusal of the court to admit testimony of J. B. Richardson, a witness for defendant, in answer to a question with reference to J. G. Gardenhire having bought for A. B. Gardenhire the home place. He testified:

"Yes, sir; he told me about helping all his children out; now in the first place he said, 'You know I bought Ben a home from you and deeded it to him.' He said he bought this place for Brown, too; 'I have done all I could for my children;' that is everything he told me."

Appellant urges that the said testimony is admissible as the declaration of J. G. Gardenhire, since deceased, and as supporting and corroborating the testimony of defendant A. B. Gardenhire, to the effect that his father furnished the money with which to pay for the N. W. ¼ of section 90, block 4, Texas & Pacific Railway Company survey, known as the Brock or home place, and as supporting and corroborating the testimony of witness Ben Gardenhire to the effect that he saw his father, J. G. Gardenhire, hand the last payment due on said premises to the defendant, and heard him say he had bought the Brock place and paid for it, and that it was Brown's property, and that plaintiff was sitting in the room when the old man made the declaration; and said testimony was further admissible as tending to prove a parol gift.

To the same effect are assignments 2 and 3. Assignment 2 complains of the failure of the court to admit the testimony of Ben Gardenhire, a witness for defendant, who was asked on direct examination by the attorney for defendant what he heard his father, J. G. Gardenhire, say with reference to buying a new place for Brown, because he had sold the place at Cotton Plant, to which the witness answered:

"I heard him say, when he first sold it, said he was going to buy Brown another one."

Assignment 3 complains of the action of the court in excluding the testimony of Locke Gardenhire, a witness for defendant, to the effect, when the witness was asked by the attorney for the defendant whether he ever heard his father say anything about buying the place up around Cotton Plant and trading it for horses and was going to replace it, to which said witness answered:

"Yes, sir; bought Brown a place and sold it to old man Colby; swapped it to him."

This last testimony, as well as the testimony to the exclusion of which assignments 1 and 2 are directed, was excluded by the court. The testimony was in effect a free translation of what purported to be the statements of the father of the defendant.

We will discuss the three assignments together. A. Brown Gardenhire testified that his father bought a place for him in 1887, near Cotton Plant, and later got a chance to trade it off to a man by the name of Colby for stock; that he told him that he would buy him another place; that when his father bought the place near Cotton Plant for the defendant a deed was made to the defendant and recorded; that a few years prior to the trial some one attempted to perfect his title to the Cotton Plant land and wanted defendant to swear that the land had been sold to Colby, as he did not take a deed when he bought it; that his father got stock in trade for the place, but never gave him any of the stock; that later he wanted to buy a place owned by a man named Brock, who lived in Carrolton, Mo.; that his father agreed to buy the place for him in about 1889 or 1890; that he sent the money through an old man who ran a little bank near where the defendant lived, and the first payment on the place was $225; that the total consideration was $750, and that the $525 was evidenced by three notes of $175 each, due 1, 2, and 3 years from date; that his father paid two of the notes himself, and that he paid the last note, amounting to $225 with interest, but his father furnished the money; that his father died in 1911; that his father left no will, but his mother made a will. What is known as the Brock place is the N. W. ¼ of section 90, block 4, Texas & Pacific Railway Company survey.

Richardson testified, as shown by the statement of facts, as follows:

"I knew old man J. G. Gardenhire. I lived by him for 4 or 5 years. I lived on White Flat there on the Ben Gardenhire place, he called it. I sold it to the old man—he bought my place for Ben, made him a present of it, and I deed-

ed it to him. He, the old man, bought my place, and had the deed made to Ben Gardenhire. He gave me 40 head of cattle for it. I had a talk with the old man some little time before he died. I don't know whether it was during his last sickness or not. He was staying at Brown's home. We were there threshing, and went in and talked with the old man; about an hour I guess. I do not know anything personally about the trade with Brock for that place, I just know Brown lived there and owned the place. I was 70 years old last December."

Ben Gardenhire testified that he was the son of J. G. Gardenhire and the brother of Brown Gardenhire, and, after testifying about the division of his mother's estate, he said:

"I know where the land deeded by Brock and his wife to Brown is, the northwest quarter of section 90. I think I know how Brown got it. Brown bought it from a man by the name of Brock, and his father paid for it for him. I seen my father pay one payment, the last payment; give Brown the money to pay for it. I have heard my father speak lots of times about buying the place and giving it to Brown. I heard my father say he had bought the Brock place and had paid for it; it was Brown's property. He handed him the last payment; handed it to him in bills right in my brother's own house. His wife was in the room sitting off a piece. I don't know whether she heard it or not, but she could have heard it, if not hard of hearing. When he made the last payment he said to Brown, 'Now I have paid for you one, and I have paid for Ben one.' Our places adjoined. My father paid for my place. I did not go to town the morning Brown paid that last note off. I don't know how much he gave Brown that time; I did not count it; it was rolled up in bills; and told him that would make his other payment, would pay his note off, and I guess he knew what it was. He said he had paid for it; that he had bought me one; and that paid off Brown's. That was the northwest quarter of section 90 where Brown is now living."

Locke Gardenhire testified in part as follows:

"My understanding of the land Brown bought from Brock in 1900 is that my father helped him pay for it. He said he had. He said he had bought Brown a place and was going to buy me one. He did not buy me a place. He did not live long then. I did not see the old man give Brown Gardenhire any money to pay to Brock. I don't know anything about that."

[1, 2] Irrespective of whether the statements made were admissible or not, we have concluded, in so far as the parts of the testimony given by Locke and Ben Gardenhire, and excluded by the court, are concerned, that there is sufficient testimony from these witnesses of the same purport given in the record as to render the exclusion of the testimony mentioned harmless. As to the testimony of J. B. Richardson, which was excluded, the same cannot be said. Declarations and answers made by persons deceased at the time of the trial are admissible under certain circumstances, namely, to prove pedigree, to prove birth, etc. We would judge from the cases cited in support of these three assignments that appellant relies, in part at least, on that class of cases holding that a statement of an ancestor or grantor under whom a litigant claims title, which tends to impeach, disparage, or deny such title, is admissible against the parties claiming under such ancestor or grantor. He cites the case of Grace, Administrator, v. Hanks, 57 Tex. 14. In that case, to establish the right of appellant to recover, reliance was had on the validity of a conveyance from Bumpass to Woolfolk. The other side introduced a statement of Woolfolk to the effect that Woolfolk had stated that he had paid nothing for the land and only took title from Bumpass for the purpose of selling the land and paying the proceeds thereof to him, in order to prevent the sale of the same by the creditors of Bumpass. The court held the admission of this testimony as proper, and that such testimony was corroborated sufficiently by other evidence, and affirmed the judgment.

In the case of Scott v. Rockwall County, 49 S. W. 932, plaintiffs below and plaintiffs in error in the Court of Civil Appeals were seeking to recover from Rockwall county the public square in the town of Rockwall. Their claim was based on the contention that they were the heirs of W. B. Bowls, who purchased the property from the original grantee, Boydson. The court admitted in evidence records of Rockwall county showing that Bowls executed to Elijah Elgin a bond for title, conveying the land in controversy. The evidence showed that Elgin and Bowls acted together in laying off the town and in dedicating the property to the public. The court held that the ancestor's declaration as to the purpose in laying out the square was admissible. This was an admission against interest, not only as to the ancestor, but as to the heirs and litigants.

Keller v. Lindow (Tex. Civ. App.) 133 S. W. 304, writ of error denied, was also a land suit case. In it evidence was introduced as to statements made by Lindow, deceased at the time of the trial, to the effect that he intended to return to the land involved and to continue to occupy it as a homestead. Objection was made to this testimony, on the ground that a witness cannot be permitted to testify as to a deceased person's statement concerning his intention, and, further, because the statements were self-serving. The court held the testimony admissible, citing Thigpen v. Russell, 55 Tex. Civ. App. 211, 118 S. W. 1080. In the last-cited case it is said that the question of abandonment of a homestead once used and occupied as such by removal therefrom is dependent upon the intention of the parties, and whether

such removal was with the fixed intent of not returning to the place as a home, and that it has been generally held that the declarations of parties are admissible on this question, notwithstanding they may seem to be self-serving.

[3, 4] In the case of 'Hammond v. Hammond, 43 Tex. Civ. App. 284, 94 S. W. 1067, the plaintiff and the defendant each claiming to be the surviving wife of Charles Hammond, then deceased, it was held admissible for the defendant to testify that Hammond handed her the deeds to the land in controversy and said: "The deeds and the land are yours; after I die the land will be yours." The decision is from one of the Courts of Civil Appeals of Texas, and cites no authority in support of the ruling. The objection to the testimony was not on the ground that it was hearsay, but that such testimony did not prove a parol gift. Ordinarily, it may be said that the declaratiõns of a deceased person as to his title in certain property is not admissible after he has parted with the title. Furthermore, inasmuch as the case was tried before the court without a jury, we are of the opinion that we should overrule all three assignments, and it is accordingly ordered.

[5] The fourth assignment is directed to that portion of the court's findings of fact "that said land (N. W. 1/4 of section 90, block 4) was purchased and paid for with the community funds of plaintiff and defendant." Mrs. Gardenhire testified as follows:

"We were married in November, 1885, and I left him in August, 1920. I filed suit for divorce July 28, 1921. You ask me what I know of my own knowledge about the purchase of the northwest quarter of section 90. I know we bought it ourselves and paid for it, and that it is community property. Mr. Gardenhire's father's name was J. G. Gardenhire. That 160 acres was not paid for, the one from Brock, by old man Gardenhire. I don't know that old man Gardenhire bought that land from Brock and had it deeded to my husband. It is deeded to my husband, and old man Gardenhire had nothing to do with it. It is not true that old man Gardenhire paid the consideration for that in cash and paid off the notes and had it deeded to Brown Gardenhire. I know that is not true, because I worked and helped pay for it; we had to rustle for the payments."

There is much testimony of Mrs. Gardenhire to the same effect, and also testimony of other witnesses to the effect that they talked to Mr. Gardenhire about whether his father had helped him to buy a place during the early years of his married life, and that the defendant told them that his father had not given him a dollar to pay on the home place where they lived. In view of this sharp conflict, we are not authorized to disturb the finding of the court.

[6] The sixth assignment is directed to the finding of the court as follows:

"The court further finds that on February 22, 1913, the defendant, A. B. Gardenhire, purchased from W. J. Gardenhire and others the S. W. quarter of section No. 49, block 6, Texas & Pacific Railway Company survey of lands, Stephens county, Tex., and paid therefor the sum of $4,000, and that four-sixteenths or $1,000 of said purchase price was paid out of the separate estate of the defendant, A. Brown Gardenhire, and that the remainder, or twelve-sixteenths of said purchase price, or $3,000, was paid out of the community funds of the plaintiff and the defendant."

The defendant and his brothers and sisters and several other witnesses testified to facts which would have tended to prove that the S. W. 1/4 of section 49, block 6, Texas & Pacific Railway Company survey, was the separate property of defendant, a part of its value being received by defendant as heir of his mother, and the balance being paid out of the separate estate of the defendant. He paid for the property $4,000, and he states that his interest in the estate amounted to $1,300, which was paid on the purchase price of the quarter section. Mrs. Gardenhire, however, testified as follows:

"You say the list shows the purchase price of the southwest quarter of section 49 block 6, Texas & Pacific Railway Company survey, as $2,472, and ask if we paid that out of the community funds. That is the last place we bought, and we paid it all except the $1,300, which we inherited, out of community porperty. The $1,300 is all he got from the estate. I don't know what the land is worth per acre now. * * * "You ask me if I don't know the place bought in 1913 on Caddo creek was bought with $2,000 that come through his father. Brown had a $1,300 interest in the estate. The $700 additional did not come from his father's estate; that was long before that. I don't know where the $700 come from. I did not have it in my possession. I don't know he did not have it. You ask what I know about this $700 coming from his father's estate. He did not have it—I don't know anything he had except the 17 head of cattle. If he had that $700 from his father's estate, I don't know how it was. The value of that place is $4,000, but $2,000 of it was not paid by Brown on what he inherited. I don't know whether he borrowed $2,000 from the bank to make the balance of the payment or not; I know he borrowed something but don't know what it was. * * * He told me when he bought the place he paid $4,000 for it, and paid on it what he inherited, and would pay the other $3,000. * * * I can't tell you positively, but think Mr. Gardenhire borrowed $2,000 from the bank at Strawn, and he was to pay Locke in payment for part of it. I know about that part of it, and the last payment was to be made, and an argument come up over it, and Brown did not want to pay it, I told him to pay it, and he was supposed to. I did not see him pay it, only know he come home and told me he paid it with some hay on the other place—he said that is what he done, but I don't know."

Article 4621, Rev. Statutes, as amended by act of 1913 (Vernon's Sayles' Ann. Civ. St. 1914, art. 4621), was in force at the time of the purchase of this property, and by that article the rents and revenues of the separate estate of the husband did not become the separate property of the husband, but community property, and it was not until 1918[1] that the article was so amended as to make the rents and revenues of the separate property of the husband his separate property (Vernon's Ann. Civ. St. Supp. 1918, art. 4621). Hence, though he paid a part of the purchase price of this property out of the revenues derived from his separate property, or from any property in which he had a separate estate, such portion of the value so paid from the revenues would become community property.

The trial court made a lump settlement, and conclude that four sixteenths or $1,000, was paid out of the defendant's separate estate, and that the balance was paid out of the community property. It would really be that thirteen fortieths was paid out of the separate estate and that twenty-seven fortieths was paid out of the community estate.

[7] Appellant's fourth assignment is leveled at the court's finding of fact "that all of the personal property listed in the inventory of the defendant was paid for and made with the community funds and efforts of both plaintiff and the defendant." In this inventory there was listed "100 head of cattle (approximately) of the approximate value of $1,000." This is listed under the head of "community property." The defendant attempted to show, during the trial, and counsel here attempts to show, that 50 head of these cattle were bought with the rents and revenues from his separate estate, and therefore did not become community property. Mrs. Gardenhire testified:

"When we separated we were supposed to have 200 head of cattle of right about 200. Cattle were worth a good price at the time we separated; were worth more than $15 a head then; they were a good price then, but I don't know how much."

Then the defendant through his attorney made an inventory, in which he showed there was 100 head of cattle owned by the community estate of the plaintiff and the defendant. We do not find ourselves called upon to disturb the finding of the court of which complaint is made.

[8] The appellee complains that she has been done an injustice by the division of the cash which was shown to be on hand at the time of the separation. This is shown to be $17,259.25. Mrs. Gardenhire testified that some months before she left the defendant she went to him while he was sick at Mineral Wells, and got a check for $10,000. The court evidently added the $10,000

to the $17,259.25 then on hand, and divided the total, which would be $13,629.62 for each. He then subtracted the $10,000 Mrs. Gardenhire had already received, and gave her a judgment for the balance. It is urged that the $10,000 should not be subtracted, inasmuch as Mrs. Gardenhire received this amount before the separation, and that the defendant had received lease rentals and royalties amounting to $97,500. Mrs. Gardenhire further testified that she left her husband on account of mistreatment, while they were both at home, and that in about a week he went to Mineral Wells; that she got the $10,000 in April before she left him in August. We are inclined to the view that the court erred in subtracting this amount, and should have awarded plaintiff and defendant each one-half of the amount of the bank deposit at the time of the separation, which was $17,259.25. We believe the defendant should be awarded as his separate estate, thirteen fortieths of the quarter section described as the S. W. 1/4 of section 49, block 6, Texas & Pacific Railway Company survey, and that plaintiff and defendant should each be awarded twenty-seven eightieths of this quarter section, and it is so ordered. As reformed in these two respects the judgment is affirmed. One-half of the costs of appeal is adjudged against each party litigant.

Reformed and affirmed.

On Motion for Rehearing.

Appellant urges that, while we may have been correct in our disposition of the assignments directed to the action of the trial court in excluding certain tendered testimony of Ben and Locke Gardenhire, we were wrong in holding that there was no prejudicial error in excluding certain testimony of J. B. Richardson; that such testimony tended to prove a parol gift.

[9, 10] In our original opinion we stated that "declarations and answers made by persons deceased are admissible under certain circumstances, namely, to prove pedigree, to prove birth, etc." We did not state, and do not mean to state, that such evidence is admissible only to prove pedigree and birth, as shown by our discussion of cases holding that they are admissible for other purposes. But we understand the rule to be that the declarations of a third person are admissible against a party whenever privity of estate exists between the declarant and the party. 1 R. C. L. p. 484. But we do not understand that the declarations of a deceased ancestor are admissible in behalf of a party to establish his title to real estate, especially where it is shown that there is no privity of estate between the ancestor and the party seeking to introduce such declarations. In the instant case it was not claimed that the father of the defendant, whose declarations were sought to be introduced, ever owned the land in controversy. The deed to the land was

---

[1] Should be 1917. See opinion on rehearing.

made by the then owner directly to A. Brown Gardenhire, and years after the passing of the deed the declarations offered were made by the elder Gardenhire, and we do not believe the evidence was admissible, either under the exception discussed or because it was res gestæ of the transaction. See 16 Cyc. pp. 985, 986. The case of Lord v. N. Y. Life Ins. Co., 95 Tex. 216, 66 S. W. 290, 56 L. R. A. 596, 93 Am. St. Rep. 827, cited by appellant, involved the delivery of an insurance policy, and the Supreme Court, in an opinion by Judge Brown, said:

"In order to sustain the judgment of the trial court and the majority of the Court of Civil Appeals, the evidence must be sufficient to justify the finding that Richard Lord gave the policy of insurance in controversy in this suit to his sister Kate, and delivered it to her in such manner as to pass the title thereto so that he had no control over the title thereafter."

The court then held admissible certain declarations made by Lord prior to and at the time of the delivery of the policy to Neil P. Anderson to be cared for for him, and specially held admissible the statement of Lord to Anderson made at the time of delivery to wit: "In this (package) is a policy for my sister Kate," etc. This testimony was admissible, perhaps, on the ground of res gestæ, and, moreover, it was admitted against the legal heir of Lord, and not in her favor. Therefore it was an admission against the interest of the person in privity with the declarant. The sister was not in privity, but the widow was. We see no reason to change our opinion as to the admissibility of this evidence.

[11] Appellant calls our attention to an error in our original opinion in stating that the amendment of article 4621, Rev. Stats., was passed in 1918. It should be 1917, and we will correct the date for the printed reports. He further urges that at least a large part of the rentals from oil leases came in after the amendment, and therefore became the separate property of Mr. Gardenhire; that Mr. Gardenhire testified that he borrowed $2,000 from the Strawn bank to pay the balance on the S. W. 1/4 of section 49, block 6, Texas & Pacific Railway Company survey. He did testify:

"That note was made payable to old man Stewart instead of the bank. I thought I was making a straight loan from the bank. That note has been paid. It was dated March 14, 1913, and due 6 months from date. That is where I got the $2,000 to complete paying out the Lacasa property, and I subsequently paid that note when I got the property from the Gardenhire heirs, and paid $2,000 and got $2,000 from the bank. I paid the bank out of the first lease money I got from that place, and Jim Stewart will hold me up in that. I did not pay it out of wheat I made on the place. I forget just when I paid that off, but the note

will show. It run on interest a long time when I leased the land. I paid it off shortly after I leased the land; after I leased section 49. I don't know the date I paid it off. I know I paid it out of * * * the first lease money I got on that land."

Appellant urges that from all the evidence in the record it appears that the lease rentals on section 49 were collected in August or September, 1917, and after the amendment to article 4621, Rev. Statutes, took effect, which seems to have been in June, 1917. But we do not feel justified in concluding, as a matter of law, that the evidence is insufficient to sustain the evident finding of the trial court that section 49 was paid out of rentals collected prior to the amendment of article 4621. The note to the bank was made in 1913, and defendant does not show, either by his testimony or by the testimony of the man from whom he borrowed the money, Mr. Stewart, or from the production of the note itself, when the $2,000 was paid. While defendant said that Stewart could "hold him up" as to when the note was paid, or it could be proved by the note itself, yet he neither offered Stewart nor the paid note to prove such fact.

On the whole we believe the motion for rehearing should be overruled, and it is accordingly so ordered.